## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF ILLINOIS

DR. WILLIAM STEVENS,

        **Plaintiff,**

v.

BOARD OF TRUSTEES, SOUTHERN
ILLINOIS UNIVERSITY, and DR. JOHN
KOROPCHAK, DR. PRUDENCE RICE,
and DR. GARY KINSEL, in their individual
capacities,

        **Defendants,**                         **No. 11-cv-126-DRH**

## ORDER

**HERNDON, Chief Judge:**

Before the Court is defendants the Board of Trustees, Southern Illinois University ("SIU"), Dr. John Koropchak, Dr. Prudence Rice, and Dr. Gary Kinsel's motion for summary judgment (Doc. 51) with regard to plaintiff Dr. William Stevens' three count complaint alleging violation of Title I of the Americans with Disabilities Act (the "ADA"), 42 U.S.C. § 12111 *et seq.*, and the Rehabilitation Act, 29 U.S.C. § 701 *et seq.*, and retaliation under the Family Medical Leave Act ("FMLA"), 29 U.S.C. § 2601 *et seq.* For the reasons that follow, defendants' motion for summary judgment (Doc. 51) is denied.

### I. Background

Page 1 of 18

Construing all facts and drawing all inferences from the record in f a v o r   o f

plaintiff, *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986), as the

Court must, the record reflects the following facts, many of which are in dispute.  Dr.

Stevens was hired by SIU in 1989 as the Director of the Nuclear Magnetic Resonance

("NMR") facility.  As Director, part of Dr. Stevens duties included maintaining and

repairing two very powerful, sophisticated NMR instruments.  The maintenance and

repair of these instruments was very technical and required the expertise of someone

like Dr. Stevens.  At times, it also required an additional  set of hands to assist with

some of the maintenance and repairs.  The actual amount of additional time and

assistance needed is in dispute.  Nevertheless, according to the position description,

a half-time assistant was assigned to the Director to assist him with his duties.  This

position description, which in its current form may be outdated, provided, in relevant

part, that the Director handles "day-to-day operation of the facility, including

scheduling of runs, set up of non-routine experiments, routine-maintenance, service,

repair and including purchasing and supervision of half-time assistant." (Doc. 51-1,

p. 12).

When Dr. Stevens first started he had a graduate assistant, but that position

went away in approximately 1992 or 1993 until 2006 due to a lack of funding.

During this time period it appears, however, that Dr. Stevens did receive assistance

from the principle electronics technician at SIU until that position was eliminated.

Starting again in 2006, until Dr. Stevens' position ended with SIU, Dr. Stevens had

a graduate assistant at various times.  The graduate assistant was either classified as

Page 2 of 18

a quarter-time assistant (less than 10 hours a week) or a half-time assistant (less than 20 hours a week) and may not have been available during periods when the university was not in session, i.e., over breaks or in between semesters.

The record further reflects a strained relationship between Dr. Stevens and many of the faculty and staff at SIU. One of the most damaged relationships appeared to be the relationship between Dr. Stevens and Dr. Prudence Rice, Dr. Steven's immediate supervisor. While the source and extent of the bad blood between Dr. Stevens and Dr. Rice is not entirely clear – there is evidence of a written reprimand to Dr. Stevens from Dr. Rice regarding a threat Dr. Stevens made after receiving unwanted email  – what is clear, is that there was a lack of effective communication between Dr. Rice and Dr. Stevens.  And while Dr. Rice was technically Dr. Stevens supervisor, it appears that she tried to delegate much of those responsibilities to other faculty, and generally did not speak to Dr. Stevens.  Indeed, while SIU policy called for annual reviews and while Dr. Stevens received a review every year until 2000 when Dr. Rice became his supervisor, Dr. Rice failed to give Dr. Stevens a review until 2008 when she delegated that task to Dr. Boyd Goodson, a professor in the Department of Chemistry and Biochemistry.  But before we get to that review, part of SIU's alleged basis for Dr. Stevens' demotion to a term position, a few more background facts need to be set forth.

In 2006, Dr. Stevens started having back problems that he originally thought resulted from an exercise injury. (Doc. 51-2, p. 32).  Dr. Stevens back problems resulted in Dr. Stevens working in "substantial pain" in order to fulfill his job

requirements.  Dr. Stevens indicated that when he started having back problems he "was unable to do magnet fills and an awful lot of repair, inspection and cleaning . . . without incurring substantial pain." (Doc. 51-14, p. 14).  "So [Dr. Stevens] worked in pain." (Doc. 51-14, p. 14).  These back problems persisted for years and affected Dr. Stevens work performance.

It was no secret that Dr. Stevens had wanted a full-time, permanent assistant to assist him in the NMR facility, and he had made these requests before he ever started having back problems.  It was also no secret, however, that after Dr. Stevens became injured, he sought out additional help due to the limitations caused by his health problems.  In as early as February 2007, Dr. Stevens began inquiring about obtaining "proper staffing in *perpetuity*" in an email he sent to Dr. Kinsel, the Chair of the Chemistry Department at SIU.  Dr. Stevens also copied Dr. Rice on this email. (Doc. 51-2, p. 32).  Dr. Stevens request for help continued throughout 2007 (Doc. 51-2, p. 35, 38, 42) and his approach in making his requests strained many of his relationships with some of the other faculty, including Dr. Kinsel who agreed with Dr. Steven's suggestion that it may be time for him to seek other opportunities elsewhere. (Doc. 51-2, p.42).  In 2008, Dr. Stevens' physicians started placing medical restrictions on Stevens' work.  Dr. Stevens was struggling to perform his work duties and the faculty, staff, and students were aware of his problems as evidenced by emails, a medical record given to Dr. Rice in May of 2008 noting Dr. Stevens' restrictions along with a hand-written note stating "[Dr. Rice] – I still need help with work[.] [-] [Dr. Stevens]," the performance evaluation completed by the Graduate

Page 4 of 18

Council, and the performance evaluation conducted by Dr. Goodson.

Indeed, the "Report on the Research Facilities / Program Review Committee

on the Graduate Council" issued by the Graduate Council in May 2009 stated the

following:

> The University would also do well to fund a Graduate Assistant, and to make available reliable electronic repair and maintenance technicians.

> Dr. Stevens needs regular assistance, at the very least, a part-time assistant to help with the cryogenic fills and setting up user accounts. The observed need for a graduate assistant assigned to the Facility on a regular basis was also shared by current NMR users.

> Dr. Stevens lost his GA and that meant he had no relief from doing repairs and maintenance requiring repetitive motions. He does this in a space so cramped that his body is forced into stress positions. Over time that has injured him and his doctor says that recovery is only possible if he leaves the lab. But if he leaves the lab, there is no one to take over his duties and researchers suffer delays. Because he is dedicated, he cuts short his recovery and attends to the lab, which helps the researchers but exacerbates the medical condition created by having no one to relieve him, by him having to do repetitive motions in stress positions. If additional staff rae [sic] are not provided it doesn't matter who is Director: at some point in time, repetitive motion and stress positions may injure the Director, and cryogenic ills could be compromised.

> The extended time that the instruments have been "off line" are a concern. Both the solids installation and Mercury 400 repair were delayed in part due to the difficulty experienced by Varian's installation engineers. The Inova 500 went down during Dr. Stevens health leave and there was no Facility staff to deal with that situation. The addition of staff would address some of these issues but not the apparent difficulty securing timely and responsive repair from the instrument manufacturers. According to Dr. Stevens, the more experienced and competent NMR engineers work through third-party companies such as Triangle Analytical and Open Technologies, although they have limited access to parts.

> Dr. Stevens is able to make minor repairs to the equipment, but does

not have a background in electronics.  Given the sophistication of the Facility instrumentation, personnel highly skilled in electronics should be available to assist with regular maintenance and repair of the NMR equipment.

(Doc. 52-2, p. 28).

Furthermore, as previously mentioned above, rather than reviewing Dr. Stevens herself, Dr. Rice delegated Dr. Stevens' annual review to Dr. Boyd Goodson, apparently the first review he received since Dr. Rice came to SUI in 2000,   On November 15, 2009, Dr. Goodson completed Dr. Stevens' "Administrative Professional Employee Performance Evaluation" for the time period November 15, 2008, through November 19, 2009.  (Doc. 51-1, p. 28).  Dr. Stevens was to be rated as either unsatisfactory, marginal, effective, highly effective, or outstanding for the following job performance factors:  1) job knowledge, 2) quality of work, 3) productivity, communication and teamwork, 4) professionalism, 5) problem solving, decision making and judgment, 6) adaptability, 7) customer service, 8) adherence to guidelines, 9) leadership and supervision, 10) organization and planning; 11) knowledge, use and care of equipment, and 12) safety and security.  (Doc. 51-1, p. 30-34).  Dr. Goodson rated Dr. Stevens as highly effective for the  knowledge, use and care of equipment, and safety and security factors.  (Doc. 51-1, p. 36).  Dr. Stevens was rated effective for the job knowledge, problem solving, decision making and judgment, adaptability, and customer service factors  (Doc. 51-1, p. 35). Dr. Stevens was rated marginal in the quality of work, productivity, and professionalism categories, and marginal and effective in the communication and team category.

(Doc. 51-1, p. 35).  Dr. Goodson gave the following comments regarding Dr. Stevens'

quality of work:

> Dr. Stevens has no problems with attention to details.  Moreover, once a repair has finally been completed, the quality is satisfactory.  However, completion of projects in a timely manner has been a continuous problem.  Dr. Stevens has made clear that this problem has largely resulted from the extensive health problems he has suffered over the past year and before. [Continued:]
>
> . . . .
>
> It is hoped that with continued successful treatment for Dr. Steven's health conditions, these issues will largely be in the past.  In any case, it is imperative that Dr. Stevens follows appropriate protocols for missing work due to medical condition: If a person is healthy enough to perform the duties for their position, then that is excellent; if however that person's health should prevent them from performing their duties, then they must follow appropriate protocols and go on medical leave, take sick days, etc.  Given the lack of knowledge that this Proxy Reviewer has for A/P rules governing sick leave, all questions are referred to Debbie Fields / HR.

(Doc. 51-1, p. 30, p. 37-38).  The following explanation was given by Dr. Goodson for

Dr. Stevens' marginal productivity rating:

> Dr. Stevens is not 'easily distracted', and the comment 'does just enough to by' does not apply either (e.g. his work is not sloppy).  However, the pace of completion of projects has been insufficient.  Again, Dr. Stevens has pointed out that this has been largely due to limitations imposed by health complications (see above).

(Doc. 51-1, p. 30).

Dr. Goodson wrote the following about Dr. Stevens' marginal professionalism

rating:

> Dr. Stevens is not 'resistant to training', and this Proxy Reviewer has little knowledge of 'applicable work conduct codes'.  However, Dr. Stevens has been absent from work during normal business hours for

too much of the time (again, largely a result of Dr. Stevens' health complications) and as a result (as mentioned above), progress on projects has been slowed significantly.   See also comments on 'Communication/Teamwork' above.

(Doc. 51-1, p. 31).  Attached to the annual review was an addendum drafted by Dr. Goodson.  In that addendum, Dr. Goodson set forth Dr. Stevens' concerns with having the review completed by someone other than his direct supervisor, Dr. Rice, and Dr. Stevens' position that it was "misguided and unfair to skip the [annual] evaluation [process] for several years and then reinstitute it abruptly without any sort of baseline having been established."   (Doc. 51-1, p. 37).   In the other comments/topics portion of the addendum, Dr. Goodson noted that Dr. Stevens "warned of the potential difficulty of meeting any new job requirements on top of his current job requirements (particularly in the absence of a permanent [graduate assistant ("GA")] position to assist cryogenic, instrument, and computer maintenance).  This Proxy Reviewer promised to renew his efforts to get reinstated a permanent GA line (of at least 25%) for the NMR Facility for these purposes."  (Doc. 51-1, p. 38-39).  Dr. Goodson also "noted that Dr. Steven's current job description [was] out of date (e.g., regarding the instrumentation in the NMR Facility) and should be updated to reflect changes that have occurred since that job description was last amended." (Doc. 51-1, p. 39).  Dr. Stevens was invited to respond to the contents of the review and, part of his comments, are as follows:

> (1)     I am dissatisfied with the tone of the references to my health problems, my absences, instrument down-time, etc., and the omission that these are all tied together.  It would have been much better to adopt the style of advocacy and appreciation that the Graduate Council

> Program Review Committee used.
>
> I experienced a four-year period of increasingly debilitating lumbar spinal stenosis. It was not diagnosed properly by my primary care physician (understandable), several physical therapists (during three extended treatment regimens), an orthopedic surgeon, or an MD physiatrist [sic]. Finally, a neurosurgeon diagnosed it and performed hemi-laminectomy surgery on three vertebrae (non-trivial), thereby mitigating the problem considerably (but not eliminating it completely; I will always have some pain problems).
>
> The Grad Council saw my resolve to give so much attention to my Facility as heroic, but your eval simultaneously criticizes me for instrument downtime because of absences and criticizes me for not taking enough sick leave. At least the [Graduate Council] could see that the obvious need was support personnel.

(Doc. 51-1, p. 40). Finally, at the end of the addendum, Dr. Goodson set forth goals for the next year for Dr. Stevens and the NMR Facility, including "[o]btaining support for a permanent 25% GA position for the Facility, under the Director's supervision[.]" (Doc. 51-1, p. 40-41).

The record also reflects that Dr. Stevens did not request time-off within the time-frame desired by SIU and failed to keep SIU apprised of his whereabouts or when he was working to SIU's satisfaction. This ultimately lead to Dr. Rice sending Dr. Stevens an email on January 22, 2009, asking Dr. Stevens to comply with university or state-wide paperwork associated with any extended absences due to illness and to fill out a "time-sheet" so avoid misunderstandings or miscommunications about when Dr. Stevens is working in the future. (Doc. 51-3, p. 17). The record contains references to several instances where either Dr. Stevens requested time-off to deal with his medical problems or SIU notifying Dr. Stevens that he needed to fill out the necessary paperwork in order take time-off. Nevertheless,

it is undisputed that Dr. Stevens was granted some FMLA leave and missed time from work in 2008 and 2009 which resulted in difficulties in keeping the NMR facility in proper working order.  Over this time, Dr. Stevens continued to request more help to manage the NMR facility.

Finally, in May 2010, a meeting was held between Dr. Koropchak, Dr. Rice's immediate supervisor, Dr. Kinsel, Dr. Rice, and others.  (Doc. 51-13, p. 13, p. 26). Either at that meeting or sometime near it, a decision was made to change Dr. Stevens' status from a continuing appointment as Director of NMR to a one-year term position.  Dr. Stevens was notified of this (and perhaps heard it from others before) by Dr. Rice in-person in June 2010 and on June 3, 2010, Dr. Rice gave Dr. Stevens official written notice of the change in the status of his position.  The written notice stated as follows:

> As indicated to you in person on June 3, 2010, and in accordance with university policy (2 Policies A.4. and C.3.h), this is your official notice that your continuing appointment as Director of the NMR Facility will not be renewed on a continuing contract.  Effective June 4, 2010, you shall hold a term position as Director until June 3, 2011.
>
> This action is being taken because of circumstances noted in the November 15, 2009, review of your performance carried out by Dr. Boyd Goodson at my request, and my response to it: the failure to maintain the facility and its instrumentation in optimum condition for faculty and student use, the low level of use of the facility and funds generated thereby, and the university's fluid and precarious budgetary situation (which has worsened since November).

(Dod. 51-1, p. 43).  Dr. Rice admitted her in deposition testimony that Dr. Stevens' health issues were considered when this decision was made to offer Dr. Stevens a term contract, but Dr. Rice was instructed not to emphasize the health problems in

Page 10 of 18

the written documentation. (Doc. 51-13, p. 30).  Rather than possibly be renewed for another one-year contract, Dr. Stevens resigned on May 31, 2011.  When Dr. Stevens left on May 31, 2011, he said that he was still able to perform his job duties.  (Doc. 51-14, p. 14).

On February 14, 2011, Dr. Stevens filed a complaint (Doc. 4) against SIU alleging two counts: 1) a violation of Title I of the ADA and 2) a violation § 504 of the Rehabilitation Act, 29 U.S.C. § 794.  On August 22, 2011, plaintiff, after obtaining leave of court, filed an amended complaint (Doc. 27), adding a claim of retaliation under the FMLA against SIU and Dr. John Koropchak, Dr. Prudence Rice, and Dr. Gary Kinsel, in their individual capacities (the "individual defendants").

On September 20, 2011, SIU filed its answer to the amended complaint (Doc. 35).  That same day, the individual defendants filed a motion to dismiss the FMLA retaliation claim against them.  On December 21, 2011, defendants filed a motion for summary judgment (Doc. 51).  On September 9, 2012, the Court denied the individual defendants' motion to dismiss (Doc. 35).  For the reasons that follow,the motion for summary judgment (Doc. 51) is denied.

## II.  Standard of Review

Summary judgment is appropriate only when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." FED. R. CIV. PROC. 56(c).  A genuine issue of material fact exists when the evidence is such that a reasonable jury could

find for the nonmovant. *Buscaglia v. United States*, 25 F.3d 530, 534 (7th Cir. 1994). The movant in a motion for summary judgment bears the burden of demonstrating the absence of a genuine issue of material fact by specific citation to the record; if the party succeeds in doing so, the burden shifts to the nonmovant to set forth specific facts showing that there is a genuine issue of fact for trial. FED. R. CIV. P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986). In considering motions for summary judgment, a court construes all facts and draws all inferences from the record in favor of the nonmoving party. *Anderson*, 477 U.S. at 255.

### III. Analysis

*A. Failure to Accommodate*

SIU argues that plaintiff's failure to accommodate claims under the ADA and the Rehabilitation Act (counts I and II) must fail because Dr. Stevens request for the hiring or reassignment of a permanent, full-time subordinate employee for the NMR facility that he could direct was not a reasonable accommodation. Because the Court finds genuine issues material fact exist as to whether SIU was aware of Dr. Stevens disability and whether Dr. Stevens was provided reasonable accommodations, defendants' motion for summary judgment is denied.

"The ADA requires an employer to make reasonable accommodations that will allow a 'qualified individual with a disability' to perform the essential functions of his or her job." *Miller v. Ill. Dep't of Transp.*, 643 F.3d 190, 197 (7th Cir. 2011) (citing 42 U.S.C. § 12112(b)(5)(A)). "Under the ADA, a failure to make reasonable accommodations for a known disability constitutes unlawful discrimination." *Mobley*

*v. Allstate Ins. Co.*, 531 F.3d 539, 545 (7th Cir. 2008) (citing 42 U.S.C. §§ 12112(b)(5)(A), 12112(a)).  In order to prevail on a failure to accommodate claim under the ADA, a plaintiff must show that 1) it is a qualified individual with a disability, 2) the employer was aware of the disability, and 3) the employer failed to reasonably accommodate the disability.  *Mobley*, 531 F.3d at 545 (quoting *EEOC v. Sears, Roebuck & Co.*, 417 F.3d 789, 797 (7th Cir. 2005)).  "In conjunction with this third element, the 'ADA requires that employer and employee engage in an interactive process to determine a reasonable accommodation."  *Mobley*, 531 F.3d at 545 (quoting *Sears, Roebuck & Co.*, 417 F.3d at 797)).

Here, defendants do not dispute that Dr. Stevens is a qualified individual with a disability.  Thus, the only two issues are whether SIU was aware of the disability and whether SIU failed to reasonably accommodate the disability.  Because genuine issues of material exist as to these two issues, defendant's motion for summary judgment must be denied as to this claim.

First, with regard to whether SIU was aware of the disability, although from the record it appears that Dr. Stevens never specifically verbally told Dr. Rice that he had a disability (in fact, it does not appear that these two spoke at all), there is no question, as Dr. Rice acknowledged, that SIU was aware of Dr. Steven's disability by at least 2009.  In fact, the record is replete with evidence that Dr. Stevens informed SIU of his disability through emails or otherwise.  SIU cannot seriously dispute that it was not aware of Dr. Stevens' disability.

Second, at issue is whether SIU failed to reasonably accommodate the

disability.  "The term 'reasonable accommodation' may include . . . job restructuring, part-time or modified work schedules, reassignment to a vacant position, acquisition or modification of equipment or devices, appropriate adjustment or modifications of examinations, training materials or policies, the provision of qualified readers or interpreters, and other similar accommodations for individuals with disabilities." 42 U.S.C. § 12111(9)(B).  "The ADA does not give employers unfettered discretion to decide what is reasonable." *Miller*, 643 F.3d at 199.  "The law requires an employer to rethink its preferred practices or established methods of operation."  *Id.* "Employers must, at a minimum, consider possible modifications of jobs, processes, or tasks so as to allow an employee with a disability to work, even where established practices or methods seem to be the most efficient or serve otherwise legitimate purposes in the workplace." *Id.*  "The ADA requires an employer to make reasonable accommodations that will allow a 'qualified individual with a disability' to perform the essential functions of his or her job." *Id.* at 197.

Here, questions of fact exist as to whether SIU reasonably accommodated Dr. Stevens.  While it appears that SIU provided Dr. Stevens with a graduate assistant to some degree during different time periods, the Court finds genuine issues of material exists as to whether this was a reasonable accommodation.  Indeed, Dr. Goodson indicated that maintaining the instrument in the chemistry department ideally required two or more people, "[a]nd three is a good number . . . ." (Doc. 51-10, p. 8). Drawing all inferences in favor of Dr. Stevens and drawing an inference that the instruments in the NMR facility needed two or three people to be maintained, a

question of fact exists as to whether SIU reasonably accommodated Dr. Stevens. Furthermore, the position description for the Director of the NMR facility states a half-time assistant would be provided. The record reflects, however, that this was not provided to Dr. Stevens on a continuous basis and that at times only a quarter-time assistant was provided. Dr. Stevens repeatedly requested more assistance than what he was provided, and whether those requests were reasonable and SIU's responses to them are heavily in dispute.

More importantly, however, the Court finds that questions of fact exist as to whether SIU engaged in an interactive process to determine a reasonable accommodation. *Mobley*, 531 F.3d at 545 (quoting *Sears, Roebuck & Co.*, 417 F.3d at 797)). The record shows that Dr. Stevens made numerous requests for assistance, and that SIU may have given Dr. Stevens a part-time graduate assistant over certain time periods, but the fact remains that Dr. Stevens requested more than this, and genuine issues of material fact exist as to whether SIU failed to engage in the interactive process with Dr. Stevens. While SIU apparently made some accommodations when funds were allowed, the record illustrates that many SUI faculty, including his immediate supervisor, Dr. Rice, had worn thin of Dr. Stevens' requests.

Dr. Rice testified in her deposition that she had received Dr. Stevens' medical records regarding his condition and his requests for help, but she did not ever contact him to try and accommodate his requests, nor did she direct anyone else to contract him. (Doc. 51-13, p. 8). In fact, Dr. Rice testified that it was her position

that "[h]e had to declare that he was having problems performing his job." (Doc. 51-13, p. 8).  With regard to the medical record sent to Dr. Rice with the handwritten note stating that he still needed help with work, Dr. Rice stated that she "regarded it as an extremely informal and non[-]serious statement that if he expected some assistance [she] expected him to send [her] an e-mail or come to [her] office or pick up the phone and say, Dr. Rice, I'm very sorry, I'm having trouble performing my job." (Doc. 51-13, p. 8).  Dr. Rice stated she expected an employee to specifically ask for an accommodation because she's "not psychic."  This does not appear to be an engagement of an interactive process to determine a reasonable accommodation, but rather two professionals behaving stubbornly.  While Dr. Stevens could have certainly made a more formal request, Dr. Rice's lack of response was certainly not much better, and nothing in the record indicates that SIU rethought any of its preferred practices or methods of operation in order to meet Dr. Stevens requests.  To the contrary, construing the facts in favor of plaintiff, the record reflects that questions of fact exist as to whether defendants reasonably accommodated Dr. Stevens' requests. Accordingly, defendants' motion for summary judgment is denied as to this point.

### B.  Retaliation

Next, defendants maintain that Dr. Stevens must proceed under the direct method of proof because Dr. Stevens has not identified a similarly situated employee who was treated more favorably than he was.  (Doc. 51, p. 17).  Under the direct method, defendants posit that Dr. Stevens must present evidence that the employer

took materially adverse action against him on the account of his protected activity. (Doc. 51, p. 17).  Defendants suggest that plaintiff cannot do this because "[t]he undisputed facts . . . , including those arising from Dr. Stevens' own emails, establish that the decision to convert his appointment from a continuing to a term contract was not because of his prior use of FMLA leave in 2009."  (Doc. 51, p. 18).  Moreover, defendants contend that an FMLA retaliation claim requires that the decision maker have an "ill intent" in punishing the employee for having invoked his FMLA rights in the past, but plaintiff cannot show an "ill intent" here.

The Court finds these arguments unpersuasive.  Certainly questions of fact exists as to whether SIU took materially adverse action against Dr. Stevens as a result of him taking FMLA leave.  It is readily apparent that SIU was trying to determine how to manage the NMR facility when Dr. Stevens took FMLA leave and ultimately defendants decided to demote Dr. Stevens to a term position.  Indeed, Dr. Rice readily admitted that Dr. Stevens' health conditions were a part of the consideration in choosing to make a him a term employee, but that she was advised not to mention that in any written correspondence.  Furthermore, questions of fact exist as to whether SIU had an ill intent.  The record reflects that Dr. Stevens' relationship with many of the faculty and staff at SIU was tenuous, and questions of fact exist as to whether any of those relationships had any affect on the ultimate decision to demote Dr. Stevens.  As a result, defendants motion for summary judgment as to this point is denied as well.

## IV. Conclusion

Page 17 of 18

For the reasons stated above, defendants' motion for summary judgment is denied.  This matter shall be set for a final pretrial conference.

**IT IS SO ORDERED.**

**Signed this 9th day of September, 2012.**

David R. Herndon
2012.09.09
17:23:05 -05'00'

**Chief Judge**
**United  States  District  Court**